AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Southern District of California

FILED

FEB 26 2020

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY DEPUTY

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

(1) 725 Poinsettia Avenue
Vista, California 92081

Case No. 20MJ0880

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A, incorporated herein by reference.

located in the _____ Southern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B, incorporated herein by reference

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC 841, 843(b), 846, 856 (a)(2); 18 U.S.C. 1956-1957 | Distribution of controlled substance, conspiracy to commit same; use of communication device in drug trafficking offense; maintaining a drug involved premises; money laundering |

The application is based on these facts:

See attached Affidavit of Special Agent Aaron Haass, FBI

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Special Agent Aaron Haass, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 2/26/20

*Judge's signature*

City and state: San Diego, CA

Hon. Michael S. Berg, United States Magistrate Judge
*Printed name and title*

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

IN THE MATTER OF THE SEARCH OF

(1) 725 Poinsettia Avenue
Vista, California 92081

Case No.:

AFFIDAVIT OF SPECIAL AGENT
AARON B. HAASS IN SUPPORT
OF SEARCH WARRANT

## AFFIDAVIT

I, Aaron B. Haass, Special Agent with the Federal Bureau of Investigation, having been duly sworn, hereby state as follows:

## INTRODUCTION

1.     This affidavit is made in support of an application to search the residence described as follows:

725 Poinsettia Avenue, Vista, California 92081 (the "Target Location")

for evidence of violations of 21 U.S.C. §§ 841(a)(1), 846, 843(b) and 856(a)(2) and 18 U.S.C. §§ 1956-1957. The Target Location has been identified as being a suspected narcotics stash and distribution house for numerous targets of a long-term narcotics and gang investigation. And as outlined below, investigators have utilized Confidential Human Sources to purchase heroin at the Target Location.  In addition, on February 20, 2020, a federal grand jury indicted the owner of the Target Location for a violation of 21 U.S.C. § 856(a)(2), maintaining a drug-involved premises, which is also known as the "Crack House Statute."  As set forth below, I believe that probable cause exists that evidence, fruits, and instrumentalities of violations of federal criminal laws may be found at the Target Location.

## TRAINING AND EXPERTISE

2.     I am a Special Agent of the Federal Bureau of Investigation, and have been so employed since February 2007. I am currently assigned to the San Diego Field Division,

1  North County Resident Agency. Prior to becoming a Special Agent, I was an Intelligence
2  Analyst (IA) assigned to the FBI Washington Field Office for over four years, from 2002
3  to 2007.   During the course of being an IA, I was assigned analytical duties on
4  counterterrorism squads in Washington, DC.

5      3.   I have received twenty-one (21) weeks of training at the FBI Academy in
6  Quantico, Virginia. During that training, I received instruction regarding a wide variety of
7  investigative techniques that are commonly used in support of a wide range of the FBI's
8  investigative priorities. The training included instruction regarding the use of sources,
9  electronic surveillance techniques, law enforcement tactics, search and seizure laws and
10  techniques, surveillance, forensic techniques, interviewing, and a variety of other subjects.
11  I have acted as the lead investigator on a variety of cases and have participated in multiple
12  cases that have focused on gang related matters.

13      4.   After the Academy, I was assigned to the FBI Washington Field Office and
14  worked on the Violent Crimes Task Force investigating primarily bank robbery and
15  carjacking cases.  In November 2010, I transferred to the FBI San Diego Division to work
16  at the Imperial County Resident Agency.  In November 2014, I transferred to the FBI San
17  Diego North County Resident Agency and shortly thereafter joined the North County
18  Regional Gang Task Force ("NCRGTF") within the San Diego Division.  During my time
19  at the NCRGTF, I have had personal contact with self-admitted or known gang members
20  and their associates and have discussed their lifestyles, method of operations regarding
21  violent and property crimes, and their drug trafficking and drug distributing activities.  I
22  have participated in investigations involving criminal gang members including, but not
23  limited to, Hispanic criminal street gangs and have performed various investigative tasks
24  involving the following:

25      a.   Functioning as a surveillance agent and thereby observing and recording
26  movements of gang members trafficking in illegal drugs and weapons, and those suspected
27  of committing violent crimes and trafficking in illegal drugs and weapons;

28

1       b.     Tracing monies and assets gained by drug traffickers from the sale of illegal
2  drugs and weapons (laundering of monetary instruments);

3       c.     Interviewing dozens of witnesses, cooperating individuals, and confidential
4  informants relative to gang activities including: violent acts, illegal trafficking of drugs and
5  the distribution of monies and assets derived from illegal trafficking of drugs;

6       d.     Monitoring and reviewing thousands of recorded jail calls as well as recorded
7  telephone calls pursuant to Title III court orders in narcotics and gang-related cases as well
8  as handled Confidential Human Sources with access to drug dealers, gang members and
9  individuals associated with the Mexican Mafia; and

10      e.     Supervising, as a case agent and co-case agent, specific investigations
11  involving criminal gangs, trafficking of drugs, weapons and the laundering of monetary
12  instruments.

13      5.     Based upon my training and experience, and consultations with law
14  enforcement officers experienced in narcotics trafficking investigations, and all the facts
15  and opinions set forth in this affidavit, I also submit the following:

16      a.     Drug traffickers, drug dealers and their co-conspirators will use cellular
17              telephones because they are mobile and they have instant access to telephone
18              calls, text, web, and voice messages.

19      b.     Drug traffickers, drug dealers and their co-conspirators will use cellular
20              telephones because they are able to actively monitor the progress of their
21              illegal cargo while the conveyance is in transit.

22      c.     Drug traffickers, drug dealers and their co-conspirators and their accomplices
23              will use cellular telephones because they can easily arrange and/or determine
24              what time their illegal cargo will arrive at predetermined locations.

25      d.     Drug traffickers, drug dealers and their co-conspirators will use cellular
26              telephones to direct drivers to synchronize an exact drop off and/or pick up
               time of their illegal cargo.

27      e.     Drug traffickers, drug dealers and their co-conspirators will use cellular
28              telephones to notify or warn their accomplices of law enforcement activity to

1   include the presence and posture of marked and unmarked units, as well as
2   the operational status of checkpoints and border crossings.

3   f.   Drug traffickers, drug dealers and their co-conspirators often use cellular
    telephones to communicate with load drivers who transport their narcotics
4   and/or drug proceeds.

5   **BASES FOR CONCLUSIONS AND SOURCES OF INFORMATION**

6   6.   As a result of my training and experience, and my conversations with other

7   Special Agents of the FBI, ATF, and HSI, Task Force Officers (TFOs) of the NCRGTF,

8   Detectives and Officers and numerous other local investigators familiar with violent crime,

9   narcotics trafficking, gang activity, and money laundering matters, I formed the basis of

10   opinions and conclusions set forth below, which I drew from the facts set forth herein.

11   Dates and times outlined below are approximate.

12   7.   I make this affidavit, in part, based upon information from: (a) oral and written

13   reports about this investigation which I have reviewed; (b) physical surveillance conducted

14   by federal agents or local law enforcement agents, which observations have been reported

15   to me either directly or indirectly; (c) debriefs of Confidential Human Sources; (d) recorded

16   calls and controlled drug buys between Confidential Human Sources and targets of this

17   investigation; and (e) queries of public record and law enforcement databases.

18   8.   Except as otherwise noted, information set forth in this affidavit has either

19   been observed or provided to me by task force officers from the NCRGTF or other multi-

20   agency federal, state, and local drug/gang task force officers with whom I have spoken,

21   whom were involved in this investigation, or whose reports I have read and reviewed.

22   Likewise, information resulting from surveillance, except where otherwise indicated, does

23   not necessarily set forth my own observations but rather has been provided directly or

24   indirectly by other law enforcement officers who conducted such surveillance.   In this

25   affidavit, I have also included, where appropriate, my interpretation of quoted and/or coded

26   language in parenthesis and/or brackets.  Those interpretations are based upon my training

27   and experience, conversations I have had with other law enforcement officers familiar with

28   this investigation, as well as my personal participation in this investigation.

4

9.     Because this affidavit is being submitted for the limited purpose of seeking the search warrant specified below, I have not set forth each and every fact learned during the course of this investigation.  Rather, I have set forth only the facts that I believe are necessary to establish the foundation for an order authorizing the requested warrant.

10.     I respectfully submit that the facts contained in the numbered paragraphs below demonstrate that there is probable cause to believe that fruits, instrumentalities, and evidence of a violation of the following enumerated offenses:  distribution of a controlled substance, and conspiracy to do the same (21 U.S.C. §§ 841(a)(1) and 846); illegal use of a communication facility (21 U.S.C. § 843(b)); maintaining a drug-involved premises (21 U.S.C. § 856(a)(2)); and money laundering (18 U.S.C. §§ 1956-1957) (hereinafter collectively referred to as the "Criminal Activity") will be found at the Target Location, which is fully described in Attachment A.

## PROBABLE CAUSE

### A.     Investigative Background

11.     The Target Location is a large approximately two-acre residential property, owned by Sean T. SHEETER, that is located across the street and approximately 100 feet from Joli Ann Leichtag Elementary School in Vista, California.

12.     The Target Location consists of a single parcel[1] (APN 217-220-10-00), with the physical address of 725 Poinsettia Avenue, Vista, California.  According to property records, the owner is Sean Terrence SHEETER.  The parcel abuts Oleander Avenue to the north and Poinsettia Avenue to the east. On the Target Location is a single-family home, which is the main structure on the Target Location.  The address associated with the single-family home is 725 Poinsettia Avenue, Vista, California 92081.  In addition to the single-family home, there are several trailers, conex-type boxes, and sheds/shacks located on the

---

[1] 725 Poinsettia Avenue used to refer to two adjoined parcels of land with a common address (APNs 217-220-10-00 and 217-220-04-00).  According to property records, in late 2019, Sean Sheeter appears to have sold APN 217-220-04-00 to a third party.  That portion of the property has been fenced off.

property.  According to property tax records, the 725 Poinsettia Avenue address is the mailing address for the Target Location.

13.    Starting in the Fall of 2016, the NCRGTF[2] began investigating illegal narcotic sales by various gang members and their associates operating in Vista, California and the surrounding areas. Investigators identified Encinitas ("ENC") Tortilla Flats gang member Colin Kenneth JONES, aka "Frosty," aka "Frost," as an individual selling heroin and methamphetamine in North San Diego County ("North County"). The investigation indicated that JONES was obtaining heroin and methamphetamine from unknown source(s) of supply, including a suspected source in Mexico. As the investigation continued, I learned that JONES was frequently traveling to Mexico to obtain narcotics from his source of supply.  Thereafter, JONES would smuggle narcotics into the United States personally and with the help of co-conspirators, which often included fellow North County gang members.  Once the narcotics were smuggled into the United States, JONES would personally distribute the narcotics or would provide narcotics to his co-conspirators, who in turn would distribute the narcotics to their end customers.

14.    During the course of my investigation into JONES and his fellow gang members and associates, I learned that JONES and several other targets of this investigation were living at and/or operating from the Target Location.

15.    My investigation further revealed that the owner of the Target Location, Sean SHEETER, who also lives at the property, allows gang members, drug dealers, and users stay at the property because in exchange they give him drugs.  Over the years, the law enforcement activity at the property has become pervasive.  In fact, during the course of my investigation, various individuals who lived, used, and/or distributed drugs from the

---

[2] Participating agencies include: the Federal Bureau of Investigation ("FBI"); San Diego Sheriff's Department ("SDSD"); Carlsbad Police Department ("CPD"); Escondido Police Department ("EPD"); Oceanside Police Department ("OPD"); Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"); Homeland Security Investigations ("HSI"); Drug Enforcement Administration ("DEA"); and the United States Marshals Service ("USMS").

1  Target Location, including JONES, were indicted and pled guilty to federal drug trafficking

2  charges.   On February 20, 2020, a federal grand jury returned an indictment charging

3  SHEETER with maintaining a drug-involved premises, in violation of 21 U.S.C. §

4  856(a)(2), otherwise known as the "Crack House Statute."   Section 856(a)(2) makes it a

5  crime for an individual to manage or control any place, whether permanently or

6  temporarily, as an owner, lessee, agent, employee, occupant, or mortgagee, and knowingly

7  and intentionally rent, lease, profit from, or make available for use, with or without

8  compensation, the place for the purpose of unlawfully manufacturing, storing, distributing,

9  or using a controlled substance.

10      **B.**   **The Wiretap Investigation**

11      16.   In May 2017, investigators obtained court authorization to intercept wire and

12  electronic communications of JONES.   Wiretap intercepts on June 8, 2017 indicated that

13  JONES was in possession of an AR-style assault rifle (shown below) and, as a result, agents

14  and officers with the NCRGTF arrested JONES at the Pala Casino, in Pala, California.



26      17.   The following images of what I believe to be the same AR-style weapon and

27  what appears to be methamphetamine were also later recovered from JONES' cellphone

28  pursuant to a federal search warrant.

7





18.     During the investigation, investigators confirmed that Jones was a significant supplier of methamphetamine and heroin to multiple gang members and associates in North County. JONES used his cellphone to discuss, coordinate, and negotiate drug transactions, to communicate with various suspected sources of supply in the United States and in Mexico, and to communicate with other gang members in his supply and distribution chain. Intercepts further allowed investigators to identify high-value gang members working jointly with JONES to further the heroin and methamphetamine trafficking conspiracy. During at least May 2017 through his arrest on June 8, 2017, JONES often resided at and

1  operated from the Target Location. Specifically, JONES had a trailer parked at the Target

2  Location from which he would distribute heroin and methamphetamine as part of his

3  distribution scheme. In fact, as set forth below, agents intercepted the address to the Target

4  Location on the wiretap. Subsequent searches of JONES' cellphone pursuant to a search

5  warrant revealed the same fact.

6       19. On May 19, 2017, agents intercepted a conversation between JONES and

7  fellow ENC gang member, David LOERA. JONES received two incoming texts from

8  LOERA. LOERA: "Do you have any white [methamphetamine] u can slide this way so I

9  can make some cash stay high n pay u [Did JONES have any methamphetamine he could

10  give to LOERA so LOERA could use some of it and sell some of it and give money back

11  to JONES] come on boy we gotta pick up the slack here I'm tired of watchen everyone

12  around me making money n taken over the spot this is our spot everyones taken advantage

13  of Tommy's [Thomas BALL's home] come by so I can talk to you [LOERA believed there

14  was an opportunity to sell narcotics and does not want other people to make money on drug

15  trafficking by selling narcotics out of the Target Location]."

16       20. On May 23, 2017, JONES sent a text message to contact "Patty" with the

17  address of the Target Location: "725 Poinsettia Ave, Vista, CA 92081." Patty responded,

18  "I'm going over there in like 20 min k." Over an hour later, JONES and "Patty" had the

19  following conversation: JONES: "K. Wya [Where ya at?]." PATTY: "Passing Civic.

20  Center. [Passing Civic Center Dr.]." Contemporaneously, JONES texted Lauren

21  VALENZUELA, his then-girlfriend, and had the following exchange: JONES: "Were the

22  fuck is the pipe. U stupid bitch, AwL [possibly, absent without leave]. Watch bitch ur

23  gonna really feel the dont give a fuck treatment." VALENZUELA: "Are you serious you

24  have the fish pipe sorry I took my own pipe I'm going to be back really soon stop acting

25  like that." JONES: "Nope fish pipe is broken so patty came for nothing an yea ull brb." In

26  the exchange above, I believe JONES was directing LOPEZ to the Target Location to

27  distribute narcotics to her [LOPEZ]. The above exchange confirms that LOPEZ drove to

28

1 | the Target Location but was unable to consume the narcotics JONES had because he did
2 | not have a working pipe.

3 |     21.   On May 28, 2017, agents intercepted a call between JONES and "Patty."
4 | Patty called JONES, but VALENZUELA answered.   Patty asked for "Frost."
5 | VALENZUELA told Patty that JONES was sleeping. Patty told VALENZUELA that she
6 | needed to "buy some white [methamphetamine]."   After a discussion about whether to
7 | wake JONES up occurred, VALENZUELA gave directions to the trailer, which agents
8 | knew was located at the Target Location. Patty told VALENZUELA that she needed $10
9 | worth [of methamphetamine].

10 |     22.   On June 2, 2017, agents intercepted a call between JONES and Matthew
11 | TRUAX.   During the call, TRUAX stated he was on his way home and asked if JONES
12 | was bummed.   TRUAX asked if they could "chill around" and "our usual [TRUAX wanted
13 | to order his normal type of narcotic]."[3]   TRUAX said "like 20 minutes or so [$20 worth of
14 | narcotics]."   TRUAX said no one else was answering [no other drug suppliers were
15 | answering his calls]. JONES then told TRUAX to come by JONES' trailer, which at that
16 | time was located at the Target Location. TRUAX stated that once he got home, he would
17 | head over.

18 |     23.   On June 6, 2017, VALENZUELA received a series of text messages from
19 | contact "JERRAMY," which were recovered from VALENZUELA's cellphone pursuant
20 | to a search warrant.[4]   JERRAMY: "Yo. I have a 22 magnum pistol that shoots the same
21 | grain rounds as a 9mm and it's super nice. It retails for $650-$700 brand new.  If your
22 | dude [Colin JONES] wants to do that and a kicker compVR with a ported box I'll trade
23 | him that. Including a shit ton of ammo. It's not like the thing you showed me. The one I
24 | have will definitely put someone down if needed." VALENZUELA: "Can u send a pic."

25 |

26 | [3] Based on my knowledge of this investigation, I believe that drug was heroin.
26 | [4] VALENZUELA was arrested on state charges on or about June 8, 2017.   She was
27 | subsequently charged and pled guilty to conspiracy to distribute heroin and
28 | methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 846. Her case is pending
    | custody and she is currently out of custody but no longer resides at the **Target Location**.

1  JERRAMY: "Yeah I will. And it's easy as fuck to hide. So that with a holster, a bunch of
2  ammo, and a 12" kicker with the ported box. It's the one that was in my truck. Or just the
3  pistol and ammo but it wouldn't be like a trade. It would just be for him [JONES] to use
4  for however long and I'll hold on to the AR [JONES' assault rifile]. Let me know. I can
5  come look at moving the trailer to if you want." Later that afternoon, VALENZUELA
6  called JERRAMY. JERRAMY responded by text message: "Yo I'm at the doctor. Call
7  you back after. Like 15 minutes." VALENZUELA: "725 Poinsettia Ave, Vista, CA
8  92081" [Target Location]. JERRAMY: "Ok. Do you guys have any W
9  [methamphetamine]. ??? I really need to smoke a bowl. Please tell me you do have some
10  ?" VALENZUELA: "Yea we do." JERRAMY: "Ok. I'm on my way. I really need to
11  smoke a bowl so I was ganna get some before coming but if you'll smoke me out for helping
12  you that would be chill. I'll be there soon."

### C.     Drug Importation Linked to the Target Location

14       24.     On September 20, 2017, Christopher TIBURSKI, the former roommate of
15  JONES and a known associate, entered the United States from Mexico at the Otay Mesa,
16  California Port of Entry.   TIBURSKI was referred to secondary inspection, where a
17  Customs and Border Protection Officer and assigned canine screened TIBURSKI.   The
18  canine alerted to TIBURSKI's groin area.   TIBURSKI was detained.   TIBURSKI was
19  advised of his *Miranda* rights. TIBURSKI waived his rights and elected to give a statement
20  without a lawyer present. TIBURSKI initially denied but later admitted he had narcotics
21  secreted in his rectum. TIBURSKI consented to search of his person. After a search of his
22  person, agents discovered a package weighing 31 grams that field-tested positive for the
23  characteristics of heroin. TIBURSKI admitted to knowledge of the narcotics on his person.
24  TIBURSKI stated that he would get money from others to travel to Mexico to purchase
25  narcotics from an unknown source of supply. TIBURSKI stated that at most (in past runs)
26  he had obtained two ounces of heroin (approximately 50 grams) at a time.   TIBURSKI
27  stated that he usually delivered the drugs to one of two locations, one of which was BALL's
28  house (Target Location). The narcotics were seized and TIBURSKI was released.

25. On October 18, 2017, LOERA entered the United States from Mexico at the San Ysidro, California Port of Entry. LOERA was referred to secondary inspection where agents advised LOERA of his *Miranda* rights. LOERA waived his rights and elected to give a statement without a lawyer present. LOERA stated in substance that he worked with BALL to import narcotics into the United States. LOERA stated his role was to drive BALL to the United States-Mexico border, wherein BALL would cross into Mexico and would retrieve narcotics that he (BALL) would smuggle back into the United States. Once back into the United States, LOERA stated that he (LOERA) would drive BALL back to his residence (Target Location). In exchange, LOERA stated he would receive a gram or two of heroin for assisting. LOERA stated that BALL imports both methamphetamine and heroin. LOERA then consented to the search of his person, wherein agents located and seized a package weighing 27.6 grams that field-tested positive for the characteristics of heroin. The narcotics were seized and LOERA was released.

**D.    Former and Current Residents of the Target Location**

26. Thomas BALL, a self-admitted Nazi Low Riders (NLR) gang member dropout, and Raymond MALDONADO, a Vista Home Boys (VHB) gang member, were additional two of the individuals selling heroin in conjunction, and separately, from JONES out of the Target Location. As outlined below, investigators determined that BALL and Maldonado conducted narcotics transactions at the Target Location. BALL's criminal history includes felony convictions for possession of a narcotic controlled substance (1990, 2004, 2007, 2008), burglary (1991), robbery (1992), and possession of a controlled substance in prison (1993). In August 2018, a federal grand jury returned an indictment charging BALL with conspiracy to distribute methamphetamine and heroin, in violation of 21 U.S.C. §§ 841(a)(1) and 846. BALL's federal case is still pending. He is currently out on bail and resides at the Target Location. The surety for the BALL's bond is Sean SHEETER.

27. MALDONADO's criminal history includes felony convictions for willful discharge of a firearm in a negligent manner (1990), assault with a deadly weapon/not a

1  firearm (1992), possession of a controlled substance (1996), felon in possession of a
2  firearm (2000), possession of a controlled substance for sale (2002), and
3  manufacture/possess a dangerous weapon (2009). In February 2018, MALDONADO was
4  charged with conspiracy to distribute heroin and methamphetamine, in violation of 21
5  U.S.C. §§ 841(a)(1) and 846. In January 2019, MALDONADO waived indictment and
6  was charged by superseding information with conspiracy to distribute heroin, in violation
7  of 21 U.S.C. §§ 841(a)(1) and 846. MALDONADO pled guilty to the superseding
8  information and was subsequently sentenced in that case.

9       13.    This investigation has included the use of Confidential Human Sources
10  ("CHSs"). As outlined below, CHS-1 and CHS-2 conducted controlled purchases of heroin
11  from MALDONADO on December 12, 2017 and BALL on December 20, 2017. Both of
12  these transactions, more fully described below, occurred on the property of the Target
13  Location.

14       **E.    Drug Distribution and Usage at the Target Location**

15          **a.  Controlled Purchases of Narcotics at the Target Location**

16       28.    On December 12, 2017, CHS-1[5] and CHS-2[6] conducted a controlled purchase
17  of approximately 3.7 grams of heroin from MALDONADO at the Target Location. CHS-

18

19  [5] CHS-1's criminal history includes the following convictions: 1993 misdemeanor
20  conviction for PC 12020(a) (possess/manufacture/sell dangerous weapon); 1994 felony
    conviction for PC 192(a) (voluntary manslaughter); 1995 felony conviction for PC 664-
21  187(a) (attempted murder); 2006 felony conviction for VC 10851(a) (auto theft); and 2017
22  misdemeanor conviction for H&S 11350(a) (possession of a narcotic controlled substance).
    CHS-1 was a target of this investigation. In September and October 2017, CHS-1 was
23  interviewed as part of the investigation and decided to cooperate with law enforcement in
    hopes of favorable consideration by the prosecutor's office as well as monetary
24  compensation. In 2018, CHS-1 was charged with conspiracy to distribute heroin, in
25  violation of 21 U.S.C. §§ 841(a)(1) and 846, pled guilty and has since been sentenced.
    [6] CHS-2's criminal history includes the following convictions: 2005 misdemeanor
26  conviction for PC 602(k) (trespass with intent to injure property). In September and
27  October 2017, CHS-2 was interviewed as part of this investigation and decided to
    cooperate with law enforcement in hopes of favorable consideration by the prosecutor's
28  office for CHS-1 as well as monetary compensation.

1  1 coordinated the narcotics transaction with recorded calls and text messages with phone
2  number 760-481-2429, which was used by MALDONADO. Prior to the narcotics
3  transaction, CHS-1 and CHS-2 arrived at the dirt lot within the Target Location. At that
4  time, MALDONADO was not yet at the Target Location. As a result, CHS-1 offered to
5  drive to MALDONADO's location to complete the transaction. But MALDONADO
6  indicated he did not currently have the narcotics with him, and they would have to meet at
7  the Target Location [implying the narcotics were stored at the Target Location]. The
8  controlled purchase was recorded, transmitted and loosely surveilled. Agents and officers
9  were able to monitor the narcotics transaction in real-time. The narcotics transaction
10  occurred in the dirt lot within the Target Location. CHS-1 and CHS-2 provided
11  MALDONADO $150.00 in exchange for approximately 3.7 grams of heroin. During the
12  transaction, MALDONADO referred to selling his other drugs to other customers prior to
13  the deal with CHS-1 and CHS-2. MALDONADO said he was trying to, "move up the
14  corporate ladder [build his drug business]."

15      29.    After the transaction, agents met with CHS-1 and CHS-2 and retrieved the
16  narcotics, which matched the appearance and likeness of heroin.

17      30.    On December 20, 2017, CHS-1 and CHS-2 conducted a second controlled
18  purchase at the Target Location, this time of approximately 3.3 grams of heroin from
19  BALL. CHS-1 coordinated the narcotics transaction with recorded calls with BALL. Prior
20  to the narcotics transaction, CHS-1 and CHS-2 arrived at the dirt lot within the Target
21  Location. CHS-1 and CHS-2 then went inside the garage area that had an attached room
22  within the Target Location. The controlled purchase was recorded, transmitted and loosely
23  surveilled. Agents and officers were able to monitor the narcotics transaction in real-time.
24  The transaction was captured on video. CHS-1 and CHS-2 provided BALL $150 in
25  exchange for approximately 3.3 grams of heroin.

26      31.    After the transaction, agents met with CHS-1 and CHS-2 and retrieved the
27  narcotics, which matched the appearance and likeness of heroin.

28

32.     On January 24, 2018, San Diego Sheriff's Department Deputies arrived at the Target Location upon finding a stolen Honda Accord on the premises.  During the course of their investigation, Deputies found methamphetamine on the bathroom floor in the room attached to the carport of the Target Location and arrested BALL for possession of the stolen vehicle. MALDONADO, among other individuals, was identified as being at the Target Location during the incident.

**b. On February 28, 2018, the FBI SWAT Team Searches the Target Location; Agents Later Interview SHEETER**

33.     On February 19 and 20, 2018, an FBI surveillance team, including an aerial component, conducted surveillance at the Target Location.  During the course of the two-day surveillance, investigators observed multiple vehicles and a bicycle entering and exiting the Target Location.  Individuals from those vehicles were often seen entering the main structure as well as the carport area, RVs, sheds/shacks, and conex-type boxes located at the Target Location. Individuals were also seen loitering around the detached carport and around the vehicles in the front yard.  Many of these movements were consistent with possible drug activity.  Individuals who came to the Target Location or were present there also appeared to move freely to and from the various structures at the Target Location.

34.     On February 28, 2018, agents in this investigation executed a federal search warrant authorized by the Honorable Jan M. Adler, United States Magistrate Judge authorizing the search of the Target Location.  On February 28, 2018, utilizing the FBI SWAT team with assistance from various state and local law enforcement officials, agents searched the Target Location.  During that search, agents located evidence of open drug use within the residence on the Target Location.



35.     Based on my training and experience, the above photographs show drug paraphernalia and indicate drug use at the Target Location.  For example, the top left photo shows measuring spoons next to needles that appear to have a brown residue consistent with heroin usage.  The top row middle photo appears to show two glass pipes, which are consistent with the smoking of methamphetamine.  The top row far right photo appears to show a spoon with brown residue, which again is consistent with heroin usage.  The bottom row once again shows what appears to be a glass pipe circled in red, which is consistent with methamphetamine use.  Finally, the last photo of a cellphone shows two needles next to it, which is consistent with the intravenous injection of heroin.  Much of these items were out in the open in the property, which buttresses my belief that drug use and distribution was open and notorious at the Target Location.

36.     During the February 2018 search, agents also located several firearms on the property inside a locked conex box (shipping container).  This included an American

1  Tactical Import AR-15 5.56 semi-automatic rifle, a Remington .22 rifle, a .243 Winchester
2  lever action model 88, rounds of .22 ammunition,  The firearms are consistent with reports
3  from cooperating defendants that various people hid guns on the property.

4      37.    On February 28, 2018, agents conducted a consensual interview of SHEETER
5  at his home, the Target Location. SHEETER was not in custody. SHEETER identified
6  himself as the owner of the Target Location. SHEETER indicated he had inherited the
7  Target Location. SHEETER indicated that the property (at that time) consisted of two two-
8  acre parcels, one of which was vacant and was for sale and an adjacent parcel with the
9  residence. SHEETER indicated that he received mail at the residence and resided at the
10  address full-time. SHEETER stated he was self-employed and was actively solving the
11  "top two physiological questions that the world faces" (no further explanation given).
12  SHEETER explained that he also has several tenants who reside permanently at the
13  address. SHEETER identified one of the regular tenants as "Tom Ball" (Thomas BALL).
14  SHEETER identified his bedroom as the room located adjacent to the kitchen and small
15  office. SHEETER indicated that BALL and another tenant were paying rent for two
16  separate spaces adjacent to the garage area of the residence.

17      38.    SHEETER was asked to identify any other people who frequented the Target
18  Location. SHEETER identified "Ray," and stated he had not seen Ray in a couple of days.
19  I believe Ray is a reference to MALDONADO, discussed earlier. SHEETER mentioned a
20  few others and explained that lots of other people regularly frequent the property to help
21  him clean out trash and vehicles, hang out with the tenants and "party." SHEETER
22  identified some of these people as "Porky-David" (David LOERA), "Chris" (Christopher
23  TIBURSKI), "Red" (Juan GONZALES), "Megan" (Megan BROWN), and others.
24  LOERA, TIBURSKI, GONZALES, and BROWN were all indicted as part of this
25  investigation on federal drug trafficking charges. All four have since pled guilty to drug
26  trafficking charges. Case Nos. 18CR0872-JLS (LOERA, TIBURSKI, BROWN);
27  18CR3650-JLS (GONZALES).

28

39.    SHEETER was asked about drug use. He responded that he smokes marijuana almost every night utilizing a pipe for the purpose of helping him sleep. Additionally, he indicated he is an occasional user of meth, heroin, and occasionally cocaine, which he prefers. SHEETER indicated that he last used meth two weeks prior. SHEETER further indicated that he is provided the controlled substances by people that come by and hang out at his residence for no charge. SHEETER was asked if there was drug paraphernalia and/or weapons and ammunition on the property. SHEETER indicated that he had marijuana and drug paraphernalia located in his bedroom.   SHEETER denied any knowledge of narcotics sales on the property.

**F.    January 2019 Arrest and Interview of SHEETER at the Target Location**

40.    Based on my review of San Diego Sheriff's Department reports, on January 9, 2019, a San Diego Sheriff's Deputy made contact with the driver of a Honda sedan in the driveway of the Target Location.   Records checks revealed the license plates were reported stolen. The deputy pulled the vehicle over and learned that the driver was Sean SHEETER.    After conducting further records checks on the vehicle and the license plates, the deputy learned that plates were registered to SHEETER but had been placed on the Honda, which had been reported stolen. In other words, the plates and the vehicle did not match. During the interaction, and based on deputies' prior interactions with the Target Location, they proceeded to conduct a security sweep of the driveway.   While a deputy processed the vehicle, another deputy learned that SHEETER lives with numerous individuals, including Thomas BALL, whom deputies confirmed had a valid Fourth Amendment waiver.   A deputy notified SHEETER that deputies wanted to contact the individuals inside his residence and SHEETER verbally consented to a search of his home.

41.    SHEETER was arrested for being in possession of stolen property, in violation of California Penal Code § 496(a).   After being verbally advised of his *Miranda* rights, SHEETER stated he understood his rights and proceeded to answer the deputy's questions about the stolen vehicle. Meanwhile, other deputies searched the Target Location. In the bedroom near the bathroom, which I believe belongs to SHEETER, deputies located a

circular piece of glass and a line consisting of a crushed, white crystalline substance. Deputies also observed razor blades and straws inside the drawer as shown below.



42.    Inside the drawer, deputies also found a checkbook with SHEETER's name and the address of the Target Location, which indicated his dominion and control of the items inside the bedroom.   SHEETER was transported to the station for processing. At the station, a deputy also tested the white crystalline substance, which field-tested positive for the characteristics of methamphetamine. As a result, SHEETER was also charged with a violation of California Health & Safety Code § 11377(a), possession of a controlled substance.

43.    SHEETER was taken to an interview room, which was video and audio recorded. SHEETER remembered his *Miranda* rights and did not need the deputy to repeat them. SHEETER indicated he lived at the Target Location with Tom (Thomas BALL) and another individual. SHEETER indicated he had recently sold one of the parcels and was trying to clear his items from that portion of the property.   SHEETER identified the bedroom near the bathroom as his personal bedroom and stated no one else lives in the room besides him. He also stated all contents inside the bedroom belonged to him. When asked about the methamphetamine located in the dresser of that bedroom, SHEETER admitted it belonged to him. SHEETER stated he only had one "line" left and stated he

1  usually acquired his methamphetamine from people he allowed to stay in the house.

2  SHEETER stated he's used methamphetamine for about eight years, but would prefer

3  cocaine.

4  **G.     November 2019 Interview of SHEETER at the Target Location**

5  44.    On November 15, 2019, San Diego Sheriff's deputies were called out to the

6  Target Location. My co-case agent on this investigation, San Diego Sheriff's Department

7  Detective Carlos Canela, and others responded to a call for the residence. Detective Canela

8  made contact with SHEETER, advised him that he was not under arrest and free to leave

9  at any time. SHEETER agreed to be interviewed. SHEETER provided several names of

10  people who live at the property. SHEETER claimed not to know the other people whom

11  deputies contacted on the property. SHEETER admitted that he drinks and uses marijuana.

12  He also stated he does cocaine but that he "can't do meth anymore." He also explained

13  that he smokes heroin every once in a while. SHEETER stated he thinks some of the people

14  on his property use drugs and admitted that he would do drugs if someone came over and

15  offered it to him. SHEETER claimed no one sells drugs from the property. SHEETER

16  admitted that he had seen people using drugs on his property, but claimed when he does he

17  tells them "to get the fuck out...but it's hard to get people lost." SHEETER explained he

18  has "problems" at his residence and was planning to fix up the property. SHEETER stated

19  "Just because I have junkies that live with me don't mean that anything is being sold here."

20  SHEETER defined junkie as "somebody that is strung out on junk...heroin."

21  **H.     Additional Cooperator Accounts**

22  45.    In 2017, CHS-3[7] identified the owner of the Target Location as Sean

23  SHEETER, which matches property records. CHS-3 advised SHEETER allows drug

24  dealers to reside on the Target Location for the benefit of obtaining free narcotics.

25  _____

26  [7] CHS-3's criminal history includes the following convictions: 2013 misdemeanor
conviction for H&S 11550(a) (under the influence of a controlled substance; 2013 felony

27  conviction for PC 530.5(a) (identity theft), felony conviction for PC459 (burglary), and
felony conviction reduced to a misdemeanor for H&S 11350(a) (possession of a narcotic

28  controlled substance); 2014 felony conviction for PC 459 (burglary); and 2017

1    46.    In June 2018, I interviewed CHS-4[8], who provided additional information
2  regarding the Target Location. In summary, CHS-4 explained the following. There are
3  multiple people living at the Target Location. It is called the "dope factory" or the "heroin
4  factory" as everyone knows it. That label is because one can go to the Target Location any
5  time of day and score [narcotics]. About the drug activity at the Target Location, CHS-4
6  indicated that everyone who goes to the Target Location knows about it and explained that
7  the only reason why someone goes to the Target Location is to "score," or get narcotics.
8  CHS-4 described that drug transactions occur at the Target Location nonstop. CHS-4 also
9  described that CHS-4 had previously lived at the Target Location and personally observed
10  drug transactions taking place and personally purchased drugs there from other individuals
11  whom I know lived at the Target Location during periods of my investigation. CHS-4
12  identified the owner of the Target Location as "Sean." During my investigation, CHS-4
13  also positively identified a photograph of SHEETER as "Sean." CHS-4 also described
14  that CHS-4 has personally used drugs in the presence of and with SHEETER. CHS-4
15  described an instance where CHS-4 was using heroin, hand a needle in CHS-4's arm, took
16  a hit from a methamphetamine pipe, and passed the pipe to "Sean" [SHEETER]. CHS-4
17  also explained that "Sean" would let allow people to stay at the Target Location in
18  exchange for kickbacks on drugs.

---

22  misdemeanor conviction for H&S 11377(a) (possession of a controlled substance). In
23  September 2017, investigators interviewed CHS-3 after becoming aware that CHS-3 was
24  interested in cooperating. CHS-3 decided to cooperate with law enforcement as a means
to not associate with drug and gang members in the future as well as possible monetary
compensation.

25  [8] CHS-4 has extensive criminal history, to include: 1998 – Permit Another to Shoot from
26  Vehicle (F); 1999 – Robbery (F); 1999 - DUI (M); 1999 – Robbery (F); 2002 – ADW:
knife (F). In addition, CHS-4 was arrested in 2018 and later pled guilty to conspiracy to
27  distribute methamphetamine and heroin and is cooperating in the hopes of reducing
28  sentencing exposure. Throughout this investigation, CHS-4 has repeatedly provided
information that has been independently corroborated and found to be truthful.

47.   In August 2018, I interviewed CHS-5[9], who provided additional information regarding the Target Location.  In summary, CHS-5 explained the following.  CHS-5 has lived at the Target Location.  CHS-5 confirmed that JONES and other targets of this investigation also lived and operated from the Target Location.  CHS-5 identified the owner of the Target Location as "Sean," whom CHS-5 identified as a methamphetamine user.  Sean [SHEETER] is aware that individuals such as CHS-5 were on the property using and selling drugs.  One of the ways that SHEETER was aware is that SHEETER has walked in on CHS-5 while CHS-5 had a needle in CHS-5's arm and had a conversation right in front of CHS-5.  CHS-5 has also observed when SHEETER has come into a room occupied by CHS-5 and others where drug paraphernalia was out in the open and visible.  CHS-5 was aware of past instances where methamphetamine was given to SHEETER by others, such as Thomas BALL, for safe storage inside the main house.  CHS-5 also stated that CHS-5 had seen pound quantities of methamphetamine at the Target Location in approximately December 2017.  CHS-5 explained that one of the things people, including CHS-5 would do, was provide the owner [SHEETER] drugs so that SHEETER would allow CHS-5 and others to stay at the Target Location.

### I.   Police Contacts at the Target Location

48.   Law enforcement activity at the Target Location between January 2017 and the present has been pervasive.  Between January 1, 2017 and February 25, 2020, there have been 53 separate calls for service or other calls to the San Diego Sheriff's Department pertaining to the Target Location.  These calls have included reports of stolen vehicles,

---

[9] CHS-5 has extensive criminal history, to include: 1999 – Disturbing the peace (M); 2000 - Resisting arrest (M); 2000 – Possession of C/S (F); 2002 – Battery on spouse (M); 2004 – Under influence of C/S (M); 2004 – Grand theft auto (F); 2009 - Battery on Spouse (M); 2010 – DUI (M); 2011 – Use/Under influence of C/S (M); 2011 – Possession of narcotic C/S (F); 2012 – Battery (M); 2014 – Identity theft (M); 2014 – Burglary (F); 2016 – unlawful possession of teargas (M).  In addition, CHS-5 was arrested in 2018 and later pled guilty to conspiracy to distribute methamphetamine and heroin and is cooperating in the hopes of reducing sentencing exposure.  CHS-5 has repeatedly provided information that has been independently corroborated and found to be truthful.

1  suspicious persons, reported thefts, recovered stolen vehicles, myriad disturbance calls,

2  burglary, grand theft, violations of restraining orders, trespass, armed suspicious persons,

3  vandalism, and a report of a threat with a weapon.

4      49.     During the same time period, there have been approximately 22 arrests and 7

5  citations issued at the Target Location.  The majority of arrests have related to possession

6  of controlled substances or stolen vehicles, but also include arrests for offenses such as

7  possession of a firearm with a prior violent offense conviction, prohibited person in

8  possession of ammunition, etc., possession of a firearm with altered identification,

9  possession of a controlled substance while armed with a loaded firearm, grand theft auto,

10  and felon in possession of a firearm.  The majority of citations were related to warrants.

11          **a.  Examples of Contacts and Arrests: January 2017 – April 2019**

12      50.     A non-exhaustive list of examples of the law enforcement contacts and arrests

13  at the Target Location are found below:

- April 6, 2019 - (SDSD #19117221) - An individual was arrested for being a felon in possession of firearm, possession of stolen firearm, and possession of methamphetamine.

- April 6, 2019 - (SDSD#19117220) - BALL and three others were arrested for outstanding warrants.

- January 8, 2019 - (SDSD#19101177) SHEETER was arrested for possession of stolen vehicle, possession of stolen property and possession of methamphetamine.  Another individuals was arrested for two warrants.

- December 12, 2018 - (SDSD#18163901) The Sheriff's Department recovered a stolen vehicle at 725 Poinsettia Avenue that was stolen from Escondido.  No arrest was made.

- November 1, 2018 - (SDSD#18156816) A report of elder abuse was made by Palomar Hospital.   The alleged male victim was involved in a physical altercation with a male name "Baltazar" at 725 Poinsettia Avenue.  The victim suffered a broken hip.

- April 16, 2018 - (SDSD#18119924) – A known gang member/narcotics user was reported missing after his mother dropped him off at 725 Poinsettia Avenue.

- April 13, 2018 - (SDSD#18119446) – An individual was arrested for possessing a controlled substance.

- April 13, 2018 - (SDSD#18119436) – A female was arrested for possession of stolen vehicle.

- March 8, 2018 - (SDSD#18112643) – BALL was arrested for a felony warrant.

- January 24, 2018 - (SDSD#18104383) – BALL was arrested for possession of stolen vehicle.

- April 1, 2017 - (SDSD#17116929) – SHEETER reported the theft of his wallet.

- January 13, 2017 - (SDSD#17102330) – BALL's son was arrested for outstanding warrants.

**b. Contacts and Arrests: December 2019 to Present**

51.   Law enforcement contacts and arrests, including for drug trafficking offenses, that are tied to the Target Location have continued until very recently.

52.   On December 4, 2019, San Diego Sheriff's Deputies received a call of a stolen work vehicle at a location in Vista, California. While driving to the location, the victim located his stolen truck in the mud in the driveway at the Target Location and saw two individuals attempting to get the truck free from the mud. As deputies arrived on scene, they saw another vehicle, a black Honda Civic attempting to exit the driveway. Deputies contacted and detained the driver. As they ran checks, numerous subjects began running away from the residence on the Target Location. The driver admitted to having drug paraphernalia and marijuana inside his vehicle. Deputies conducted a search of the vehicle and located a large clear bag containing a white crystalline substance hidden behind the stereo compartment of the vehicle. During the search of the vehicle, deputies located 412.73 grams (1.13 pounds) of methamphetamine, 57.80 grams of marijuana, 69.6 grams of heroin, .40 grams of cocaine, a scale, 10 zip-lock baggies. The driver of the Honda Civic was arrested for two counts of possession of a controlled substance for sale (Cal. Health & Safety Code §§ 11378, 11351) and transportation of a controlled substance (Cal. Health & Safety Code § 11379(a)) and other charges. In addition, a second male at the Target

24

1  Location was arrested for carrying a concealed dirk or dagger, in violation of California
2  Penal Code § 21310.

3      53.    On February 18, 2020 (SDSD #20108748), an individual was arrested for
4  motorcycle theft and being in possession of a stolen vehicle.  A second individual was
5  arrested for possession of a usable quantity of methamphetamine. Both arrests occurred at
6  the Target Location.  At the time of the arrests, SHEETER was present.

7      54.    As set forth above, I believe the owner of the Target Location, SHEETER, is
8  a drug user who allows drug dealers, gang members and violent felons to reside on the
9  property of the Target Location for the benefit of obtaining free narcotics.  Evidence further
10  confirms that numerous people move freely between the various structures at the Target
11  Location.  I therefore believe that various dwellings are occupied in common, or are under
12  common control, and that the entire property is suspect.

13                **BASIS FOR EVIDENCE SOUGHT IN SEARCH WARRANT**

14      55.    Based upon my training and experience, consultation with other law
15  enforcement officers experienced in drug investigations, and all the facts and opinions set
16  forth in this affidavit, I believe that probable cause exists that the Target Location is being
17  used to further the distribution of controlled substances and will likely contain evidence of
18  such crimes.

19      56.    In addition, I know that:

20          a.    Individuals involved in narcotics trafficking often maintain the
21  following items in their residences and vehicles: controlled substances and paraphernalia
22  for packaging, weighing, cutting, testing, distributing and manufacturing controlled
23  substances. They will commonly have this contraband on hand, secreted at their premises
24  or on their person or in their vehicle, in order to maintain the confidence of their customers
25  as well as to satisfy their own habits. The selling of such contraband is an ongoing type of
26  business, because it takes time to develop clientele, the nature of drug abuse requires a
27  steady supply, and the business tends to be too lucrative to abandon. They also have "fruits"
28  of their illegal sales on hand, including United States currency and other valuables.

1         b.     Individuals involved in narcotics trafficking often maintain records of
2  their narcotics transactions and other records of evidentiary value for months or years at a
3  time. It is common, for example, for narcotics traffickers to keep pay/owe sheets or other
4  papers of narcotics sold and monies owed.  Such pay/owe sheets or papers are used as a
5  basis for accounting and for settling existing debts. Such records are often maintained for
6  a substantial period of time even after the debts are collected. I have found in my training
7  and experience that such records are invaluable to narcotics traffickers and that such
8  records are rarely discarded. Finally, it has also been my experience that such records and
9  pay/owe sheets also frequently include the names, identities and telephone numbers of
10  suppliers, customers and coconspirators.

11         c.     Individuals involved in narcotics trafficking must often rely on others
12  to obtain their drugs and to help them market the narcotics. Frequently, traffickers maintain
13  evidence of the identities of these co-conspirators at their residence and their vehicles.

14         d.     Individuals involved in narcotics trafficking often utilize stash houses
15  to store illegal narcotics; weigh, cut and package the illegal narcotics; store narcotics
16  proceeds, and/or store information relating to their drug trafficking business.

17         e.     Individuals involved in narcotics trafficking commonly earn income in
18  the form of cash and try to legitimize these profits. In order to do this, traffickers frequently
19  attempt to secrete, transfer and conceal the money by means, including, but not limited to:
20  placing assets in names other than their own to avoid detection while maintaining control;
21  laundering the money through what appears to be legitimate business or businesses; hiding
22  money in their homes, safes and safety deposit boxes; or using the money to buy assets
23  which are difficult to trace. Records of these and other types of transactions are often found
24  at the residences of individuals involved in narcotics and firearms trafficking.

25         f.     Individuals involved in narcotics trafficking often keep and maintain
26  large amounts of United States currency at their residences and in their vehicles. Such funds
27  are often used for every-day expenditures and to maintain and finance their ongoing
28  narcotics business.

g.      Additionally, individuals involved in narcotics trafficking often amass and maintain assets at their residence which were generated by their trafficking activities, or purchased with the cash earned from such trafficking.

h.      Individuals involved in narcotics trafficking often maintain weapons, firearms and ammunition on their person or in their residence and/or vehicles. Such weapons and firearms are used, and can be used, as an instrumentality of the crime of possession and distribution of drugs and firearms. Furthermore, I am aware of instances in which traffickers have maintained such items in their residences and vehicles in order to protect themselves and guard their drugs, firearms and profits, as well as for enforcement purposes during their narcotics and firearms dealings.

i.      Residences and premises used by individuals involved in narcotics trafficking usually contain articles of personal property evidencing the identity of person(s) occupying, possessing, residing in, owning, frequenting or controlling the residence and premises.

j.      Individuals involved in drug trafficking often maintain cellular telephones at their residence, residence of associates, places of business, in their vehicle, and/or on their person for the purpose of arranging transactions. Persons attempting to arrange for the sale, purchase, transportation and manufacture of controlled substances frequently will contact their illegal business customers, purveyors, and associates to negotiate business deals.  Further, it has been my experience that those involved in drug trafficking maintain contact information for other co-conspirators in their cellular telephones. In particular, there is probable cause to believe that the following may be found stored in the cellular telephones at the Target Location:   Electronic records, communications, and data including, but not limited to emails, text messages, photographs, audio files, videos, and location data, on digital devices:

(1)     tending to identify efforts to possess or distribute controlled substances or the manufacture or sale of firearms;

1              (2)    tending to identify accounts, facilities, storage devices, and/or

2 services–such as email addresses, IP addresses, and phone numbers–used to facilitate

3 efforts to possess or distribute controlled substances or the manufacture or sale of firearms;

4              (3)    tending to identify co-conspirators, criminal associates, or others

5 involved in possessing or distributing controlled substances or manufacturing or selling

6 firearms;

7              (4)    tending to identify travel to or presence at locations involved in

8 the possession or distribution of controlled substances or the manufacturing or sale of

9 firearms, such as stash houses, load houses, or delivery points;

10             (5)    tending to identify the user of, or persons with control over or

11 access to, the digital devices; and/or

12             (6)    tending to place in context, identify the creator or recipient of, or

13 establish the time of creation or receipt of communications, records, or data involved in the

14 activities described above.

15    57.    It is also my opinion and belief that the above-described documents are

16 currently possessed by narcotics dealers and manufacturers much the same way a

17 legitimate business will maintain records and tools of its trade whether or not the business

18 has a particular item in inventory on a given date. These documents are kept by narcotics

19 dealers whether or not the dealer is in possession of any drugs or chemicals at any given

20 moment.

21             **PROCEDURES FOR ELECTRONICALLY STORED INFORMATION**

22                     **AS TO ANY CELLULAR TELEPHONE**

23    58.    It is not possible to determine, merely by knowing the cellular telephone's

24 make, model and serial number, the nature and types of services to which the device is

25 subscribed and the nature of the data stored on the device. Cellular devices today can be

26 simple cellular telephones and text message devices, can include cameras, can serve as

27 personal digital assistants and have functions such as calendars and full address books and

28 can be mini-computers allowing for electronic mail services, web services and rudimentary

1   word processing. An increasing number of cellular service providers now allow for their
2   subscribers to access their device over the internet and remotely destroy all of the data
3   contained on the device. For that reason, the device may only be powered in a secure
4   environment or, if possible, started in "flight mode" which disables access to the network.
5   Unlike typical computers, many cellular telephones do not have hard drives or hard drive
6   equivalents and store information in volatile memory within the device or in memory cards
7   inserted into the device. Current technology provides some solutions for acquiring some
8   of the data stored in some cellular telephone models using forensic hardware and software.
9   Even if some of the stored information on the device may be acquired forensically, not all
10  of the data subject to seizure may be so acquired. For devices that are not subject to
11  forensic data acquisition or that have potentially relevant data stored that is not subject to
12  such acquisition, the examiner must inspect the device manually and record the process
13  and the results using digital photography. This process is time and labor intensive and may
14  take weeks or longer.

15      59.    Following the issuance of this warrant, I will collect the subject cellular
16  telephone and subject it to analysis. All forensic analysis of the data contained within the
17  telephone and its memory cards will employ search protocols directed exclusively to the
18  identification and extraction of data within the scope of this warrant.

19      60.    Based on the foregoing, identifying and extracting data subject to seizure
20  pursuant to this warrant may require a range of data analysis techniques, including manual
21  review, and, consequently, may take weeks or months. The personnel conducting the
22  identification and extraction of data will complete the analysis within ninety (90) days of
23  the date the warrant is signed, absent further application to this court.

24                  **GENUINE RISK OF DESTRUCTION OF DATA**

25      61.    Based upon my experience and training, and the experience and training of
26  other agents with whom I have communicated, electronically stored data can be
27  permanently deleted or modified by users possessing basic computer skills. In this case,

28

1 | only if the subject receives advance warning of the execution of this warrant, will there be
2 | a genuine risk of destruction of evidence.

### PRIOR ATTEMPTS TO OBTAIN DATA

4 |     62.    The United States previously searched the Target Location[10] on February 28,
5 | 2020 pursuant to a federal search warrant.

### REQUEST FOR SEALING

7 |     63.    This is an ongoing investigation of which the targets are unaware. It is very
8 | likely, based upon the above, that evidence of the crimes under investigation exists in the
9 | direct and indirect control of the targets. There is reason to believe, based on the above,
10 | that premature disclosure of the existence of the warrant will result in destruction or
11 | tampering with that evidence and seriously jeopardize the success of the investigation.
12 | Accordingly, it is requested that this warrant and its related materials be sealed until further
13 | order of the Court.

### CONCLUSIONS

15 |     64.    Based on all of the above, my experience and training, a review of documents
16 | and other relevant information I believe to be reliable, and discussions with other law
17 | enforcement officers, it is my opinion that the items listed in Attachment B are fruits,
18 | instrumentalities or evidence of a violation of the following enumerated offenses:
19 | distribution of controlled substance, and conspiracy to do the same (21 U.S.C. §§ 841(a)(1)
20 | and 846); illegal use of a communication facility (21 U.S.C. § 843(b)); maintaining a drug-
21 | involved premises (21 U.S.C. § 856(a)(2)); and money laundering (18 U.S.C. §§ 1956-
22 | 1957). It is also my opinion that there is probable cause to believe that the items set forth
23 | in Attachment B are present at the Target Location, as more fully described in Attachment
24 | A.

---

26 | [10] In 2018, agents obtained authorization to search two parcels of land that together
27 | constituted a four-acre property and had the address "725 Poinsettia Avenue, Vista,
28 | California." As set forth in my affidavit, one of the parcels, which was an unimproved
portion of the property, has since been sold to an unknown third party.

1       65.    With the above information, I formally request the issuance of a search

2   warrant authorizing a search of the Target Location and the seizure of items described with

3   particularity in Attachment B to the Application and Affidavit for Search Warrant.

4       66.    I declare under penalty and perjury the foregoing is true and correct to the best

5   of my knowledge and belief.

6

7                                      Aaron B. Haass

8                                      FBI Special Agent

9   SUBSCRIBED and SWORN to before me this 26 th day of February, 2020

10

11

12   Honorable Michael S. Berg

13   United States Magistrate Judge

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# ATTACHMENT A

725 Poinsettia Avenue, Vista, California 92081

## DESCRIPTION OF PROPERTY TO BE SEARCHED

The premises (depicted below) and all parts therein, including all rooms, safes, storage containers, surrounding grounds, trash areas, abandoned vehicles, sheds, shacks, conex-type boxes (shipping containers), garages, recreational vehicles (RVs), trailers, mobile homes assigned to or part of the residence located at 725 Poinsettia Avenue, Vista, California 92081 (San Diego County Assessor's Parcel Number (APN) 217-220-04-00). The premises consists of a large lot containing a main structure as well as several trailers, sheds, shacks, and/or mobile homes. A satellite image with parcel overlay showing the approximate contours (red rectangular box) of the premises is set forth below.



As shown above, the premises abuts Oleander Avenue on its northern most point, and abuts Poinsettia Avenue on the eastern edge of the premises.

The rear of the premises (western edge) is marked by fencing as depicted below[11]:



The main residence is a single-family residence with a red colored wood exterior, brown roof, and white wood trim and a separate garage with an attached room. The front of the residence faces west, and the numbers "725" are located on a white mailbox located on the street in front of the residence. The premises has a long dirt driveway, which is accessible from Poinsettia Avenue, that leads to the main residence. The main residence is further depicted in the following photographs, which are from different overhead angles:



[11] The aerial images in Attachment A are all from February 2018. Non-permanent structures such as trailers, conex boxes, as well as depicted vehicles may have changed or moved around or from the property since then.



As depicted below, the premises also includes what appear to be shacks, sheds and trailers (indicated with red arrow(s)) next to the main structure.





1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



## ATTACHMENT B
### ITEMS TO BE SEIZED

There is probable cause that the following constitute evidence of violations of 21 U.S.C. §§ 841(a)(1) and 846; 21 U.S.C. § 843(b); 21 U.S.C. § 856(a)(2); and 18 U.S.C. §§ 1956-1957 and that they will be found in the Target Location:

1.     Controlled substances, including heroin and methamphetamine.

2.     Paraphernalia for packaging, using, weighing, cutting, testing, distributing, and identifying controlled substance(s).

3.     Firearms, ammunition, and/or any components or accessories for firearms, such as magazines, sights/scopes, silencers, or bump stocks.

4.     Documents containing data reflecting or memorializing the ordering, possession, purchase, storage, distribution, transportation and sale of controlled substances, including buyer lists, seller lists, pay owe sheets, records of sales, log books, drug ledgers, personal telephone/address books containing the names of purchasers and suppliers of controlled substances, electronic organizers, Rolodexes, telephone bills, telephone answering pads, bank and financial records, and storage records, such as storage locker receipts and safety deposit box rental records and key.

5.     Money, assets, and evidence of assets derived from or used in the purchase of controlled substances and records thereof, including but not limited to United States currency, negotiable instruments and financial instruments including stocks and bonds, and deeds to real property, books, receipts, records, bank statements and records, business records, money drafts, money order and cashiers checks receipts, passbooks, bank checks, safes and records of safety deposit boxes and storage lockers.

6.     Documents and articles of personal property reflecting the identity of persons occupying, possessing, residing in, owning, frequenting or controlling the premises to be searched or property therein, including keys, rental agreements and records, property acquisition records, utility bills and receipts, photographs, answering machine tape recordings, telephone, vehicle and/or vessel records, canceled mail envelopes,

1  correspondence, financial documents such as tax returns, bank records, safety deposit box
2  records, canceled checks, and other records of income and expenditure, credit card records,
3  travel documents, personal identification documents and documents relating to obtaining
4  false identification including birth certificates, drivers license, immigration cards and other
5  forms of identification which the same would use other names and identities other than his
6  or her own.

7      7.    Photographs and video and audio recordings which document an association
8  with other coconspirators and/or which display narcotics, firearms, or money and proceeds
9  from narcotics transaction.

10     8.    Travel documents including itineraries, airline tickets, boarding passes, motel
11  and hotel receipts, rental car receipts, passports and visas, credit card receipts, shipping and
12  receiving documents relating to the delivery of packages.

13     9.    Any cellular telephones found therein or on any person at this Target Location
14  (seizure only).

15     10.   The cellular telephone of SHEETER (search and seizure).

16        Authorization to search the cellular telephones includes the search of disks,
17  memory cards, deleted data, remnant data, slack space, and temporary or permanent files
18  contained on or in the cellular telephone.  The seizure and search of the cellular telephone
19  will be conducted in accordance with the affidavit submitted in support of the warrant.  The
20  evidence to be seized from the cellular telephone will be electronic records,
21  communications, and data such as emails, text messages, photographs, audio files, videos,
22  and location data, for the period of **September 1, 2016** through **the date this warrant is**
23  **executed**:

a.    tending to indicate efforts to deliver controlled substances from Mexico to the
United States, to traffic, sell or distribute controlled substances in the United
States;

b.    tending to identify other facilities, storage devices, or services – such as e-
mail addresses, IP addresses, phone numbers – that may contain electronic
evidence regarding efforts to deliver controlled substances from Mexico to the

37

United States, to traffic, sell or distribute controlled substances in the United States;

c.     tending to identify co-conspirators, criminal associates, or others involved in efforts to deliver controlled substances from Mexico to the United States, to traffic, sell or distribute controlled substances in the United States;

d.     tending to identify travel to or presence at locations involved in efforts to deliver controlled substances from Mexico to the United States, to traffic, sell or distribute controlled substances in the United States, such as stash houses, load houses, or delivery points;

e.     tending to identify the user of, or persons with control over or access to, the subject phone; or

f.     tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data above.

All of the above constituting: (1) evidence of a violation of distribution of controlled substance, and conspiracy to do the same (21 U.S.C. §§ 841(a)(1) and 846); illegal use of a communication facility (21 U.S.C. § 843(b)); maintaining a drug-involved premises (21 U.S.C. § 856(a)(2)); and money laundering (18 U.S.C. §§ 1956-1957); (2) contraband, fruits of the same offense or other items illegally possessed; or (3) property designed for use, intended for use, or used in committing this offense.